IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALEXANDER GOLDSTEIN, MARK FRIEDGAN, ALEXG HOLDINGS, LLC and MIF, LLC,<br><br>                    Plaintiffs,<br>  -against-<br><br>MICHAEL PARRELLA, SR., MICHAEL PARRELLA, JR., JON TAIBER, and STEVEN MALKIEWICZ,<br><br>                      Defendants. | Civil Action No. 19-cv-3029<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Alexander Goldstein ("Goldstein"), Mark Friedgan ("Friedgan"), ALEXG HOLDINGS, LLC ("ALEXG"), and MIF, LLC ("MIF") (collectively "Plaintiffs"), by and through their attorneys, Lynch Thompson, LLP, hereby state as follows as their complaint against Michael Parrella, Sr. ("Parrella, Sr."), Michael Parrella, Jr. ("Parrella, Jr."), Jon Taiber ("Taiber"), and Steven Malkiewicz ("Malkiewicz") (collectively "Defendants"):

## INTRODUCTION

1. Prior to a September 2017 sale of all assets, ESCO Advisors, LLC ("ESCO") was an entity engaged in providing consulting and technical services to companies that supply retail energy services.

2. Plaintiffs Goldstein and Friedgan, and all Defendants, were members of the ESCO Board of Managers ("Managers") prior to September 2017.

3. Goldstein and Friedgan also were investors in ESCO, making their investments through ALEXG Holdings, LLC and MIF, LLC, with the ALEXG and MIF entities becoming ESCO Members.

1

4. In mid-2017, a potential buyer approached ESCO about a possible acquisition of ESCO's assets and business. Negotiations ensued over several months. Eventually, ESCO and the buyer reached an agreement on a sale of all ESCO assets (the "Asset Purchase Agreement" or "APA"), which Agreement ESCO Managers and Members were required to review and approve. In their capacities as Members and Managers, Plaintiffs were asked to assent to the terms of the APA. In reliance on the representations made to them by Defendants and on the terms of the APA that had been provided to them, Plaintiffs agreed to the terms of the sale.

5. Goldstein and Friedgan, individually and as Members acting on behalf of ALEXG Holdings and MIF, signed off on the deal, however, only because they had been affirmatively misled. Defendants deceived Plaintiffs, to induce them to approve the APA, in the following ways:

- As part of the Asset Purchase Agreement, ESCO and its Members warranted to the buyer that, as of the date of the sale, there had been no unauthorized disclosure or misappropriation of ESCO Intellectual Property. Within three months of Defendants' affirmation of this warranty, ESCO and Defendants alleged exactly the opposite – that one of Plaintiffs' affiliates, Eligo Energy, LLC ("Eligo") allegedly stole ESCO Intellectual Property in 2012-2015.

- Defendants affirmatively concealed from Plaintiffs their intent to sue Plaintiffs as soon as the ink on the Asset Purchase Agreement was dry. The Agreement contains a schedule that lists assets excluded from the sale. In all drafts of the Purchase Agreement that were shared with Plaintiffs prior to their signatures, that schedule included one asset – a set of bank accounts at JP Morgan. After Plaintiffs approved the APA, Defendants surreptitiously revised that schedule to add a cause of action against Plaintiffs' businesses. Defendants never provided Plaintiffs with the revised schedule until after the purchase was finalized. Instead, Defendants collected the requisite approvals and THEN revised the APA to hold back ESCO's right to sue Plaintiffs.

6. Since December of 2017, Plaintiffs and their companies continuously have been defending themselves in ongoing lawsuits brought by ESCO and Defendants, relating to actions that occurred prior to the September 2017 sale of ESCO's assets. If Defendants had not purposefully and intentionally misled them, Plaintiffs would not have assented to the Asset Purchase Agreement, would not have encumbered their companies and future activities with a non-

2

competition agreement, and would not have been forced to fend off ESCO's frivolous, but expensive, litigation.

## PARTIES

7. Plaintiff Alexander Goldstein is a citizen and resident of Cook County, Illinois.

8. Plaintiff Mark Friedgan is a citizen and resident of Cook County, Illinois.

9. Plaintiff ALEXG Holdings, LLC is a limited liability company organized under the laws of the state of Alaska with a principal place of business in Cook County.

10. Plaintiff MIF, LLC is a limited liability company organized under the laws of the state of Alaska with a principal place of business in Cook County.

11. Defendant Michael Parrella, Jr. is a resident and citizen of Connecticut. Parrella, Jr. owned more than 80,000 Class B units in ESCO as of September 2017, with at least some of the Class B units' vesting schedule accelerated upon execution of the APA. Moreover, Parrella, Jr. became the CEO of the entity acquiring ESCO's assets through the APA. Parrella, Jr. also received a bonus of $208,166.03 upon closing. Therefore, Parrella, Jr. stood to receive a personal, financial benefit if ESCO were sold.

12. Defendant Michael Parrella, Sr. is a resident and citizen of Texas. Parrella, Sr. was appointed to the Board of Managers to represent the interests of Jon Parrella, who owned 188,493 Class A and B units in ESCO as of September 2017. Jon Parrella also received a deferred compensation bonus of $46,000.00 as part of the APA. Parrella, Sr. is the father of Parrella, Jr and Jon Parrella. Therefore, Parrella, Sr. stood to receive a personal, financial benefit if ESCO were sold.

13. Defendant Jon Taiber is a resident and citizen of Iowa. Taiber represented the interests of Skydeck Holdings I, LLC ("Skydeck") on ESCO's Board of Managers and owned an

interest in Skydeck, which was the largest investor in ESCO as of September 2017. Additionally, Taiber's compensation from Skydeck is tied to performance of investments that he managed for Skydeck. Therefore, Taiber stood to receive a personal, financial benefit if ESCO were sold.

14. Defendant Steven Malkiewicz is a resident and citizen of Florida. Malkiewicz owned an interest in St. Clair Energy Associates, LLC, which was the second largest investor in ESCO. Malkiewicz also received a closing bonus of $41,633.21 and deferred compensation of $30,000 as part of the APA. Therefore, Malkiewicz stood to receive a personal, financial benefit if ESCO were sold.

## **VENUE AND JURIDICTION**

15. This Court has jurisdiction over all claims in this Complaint pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between plaintiffs, who are citizens of Illinois and Alaska, and Defendants, who are citizens of four other states – Parrella, Jr. (a Connecticut citizen), Parrella, Sr. (a Texas citizen), Taiber (an Iowa citizen), and Malkiewicz (a Florida citizen).

16. In this action, Plaintiffs seek to recover money damages caused by the Defendants' fraud, including the amounts spent defending against the lawsuits filed against them in Connecticut, the amounts by which their investments have been diminished, and the lost value of their ESCO interests. Plaintiffs believe their damages to be in excess of $2,000,000, but certainly far in excess of the $75,000 amount in controversy requirement.

17. Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District, and all four Plaintiffs suffered injury in this District.

4

**FACTUAL ALLEGATIONS**

ESCO, Eligo and Plaintiffs Establish Business Relationships

18. In 2012, an Illinois retail energy supplier, Eligo Energy, LLC, entered into a consulting and services contract with ESCO.

19. Plaintiffs Goldstein and Friedgan are executives at Eligo, while Plaintiffs ALEXG Holdings and MIF are investors in Eligo.

20. Shortly after Eligo entered into its consulting services contract with ESCO, ALEXG HOLDINGS and MIF invested money in ESCO, thereby becoming Members of ESCO. Also, ESCO named Goldstein and Friedgan to the ESCO Board of Managers, thereby making them Managers of ESCO.

21. When ALEXG HOLDINGS and MIF invested in ESCO, they provided ESCO with contact information informing ESCO that both entities conducted business in Illinois and would receive all communications in Illinois.

22. Plaintiffs Goldstein and Friedgan provided ESCO with contact information informing ESCO that Goldstein and Friedgan reside, conduct business and receive communications in Illinois. This information was contained in Exhibit B to the 2013 version of the ESCO operating agreement.

23. In its consulting agreements with Eligo, ESCO acknowledged that Eligo's principal place of business is Illinois. Throughout all times relevant to this Complaint, Defendants knowingly directed their communications with Plaintiffs to Illinois, and knew that all communications with Plaintiffs would be received in Illinois.

24. Eligo and ESCO entered into an updated version of their consulting and services agreement in June 2015. As part of that June 2015 contract, ESCO and Eligo entered into a

5

Payment Agreement pursuant to which Eligo agreed to pay certain amounts to ESCO, and ESCO agreed to waive and release Eligo, together with its directors, officers, employees, agents, affiliates, subsidiaries, successors, and assigns from all claims, known and unknown, that ESCO had against Eligo as of June 12, 2015.

<u>The Possible Acquisition Transaction</u>

25. In 2017, a private equity company, Five Elms, approached ESCO management and expressed an interest in acquiring ESCO.

26. Over the course of several months, ESCO and Five Elms negotiated the terms of a potential transaction. Defendants Michael Parrella, Jr. and Taiber negotiated on behalf of ESCO, keeping the Managers apprised of the progress. Plaintiffs were not part of the ESCO team negotiating with Five Elms.

27. By early August, the ESCO negotiating team – Defendants Parrella, Jr. and Taiber – had made enough progress that they entered into a Letter of Intent ("LOI") with Five Elms on a sale transaction. The Defendants shared this LOI with Plaintiffs and the other ESCO Members and Managers.

28. That LOI made reference to possible restrictions being placed on the future business activities of ESCO Members and/or Managers. Plaintiffs specifically noted to Taiber that Plaintiffs would need to carefully review any provisions restricting the future activities of ESCO and its Members -- if any such provisions were included in the final transaction -- to evaluate possible impacts on Plaintiffs' other investments and business interests. Plaintiffs heard nothing more about possible restrictions on competition for several weeks.

29. Soon after ESCO and Five Elms signed the LOI, they began exchanging drafts of an acquisition agreement. Defendants directed drafts to the Plaintiffs in Illinois. All drafts

6

supplied to Plaintiffs in August 2017 contained a section entitled Representations and Warranties of the Seller [ESCO], and included a representation and warranty that:

> There has not been any unauthorized disclosure of any Intellectual Property Assets by Seller or by any, as applicable, member, manager, stockholder, director, officer or employee of the Seller. To the Knowledge of the Seller, there is not and has not been any unauthorized use or disclosure, infringement, misappropriation or other violation of any Intellectual Property Assets by any person.

30. All August 2017 drafts also stated that ESCO is deemed to have "Knowledge" of a fact if a current or former (within 12 months) member of the Board of Managers, or Steve Malkiewicz, Parrella, Jr., Chris Waring or Jon Parella has knowledge of that fact after reasonable inquiry.

31. Taken together, the "Knowledge" definition and the representation and warranty as to IP rights made clear that no one at ESCO, specifically including Defendants Parella Jr. and Malkiewicz, was aware of or believed there had been any misappropriation or infringement of ESCO's IP rights.

Defendants Seek Written Consent from Plaintiffs

32. By August 25, 2017, negotiations had progressed far enough that ESCO sought formal, written Consent from a majority of its Members to consummate the transaction. Defendants Taiber and Parrella Jr. provided drafts of the proposed Asset Purchase Agreement to ESCO Members representing more than 51% of the outstanding interests, supplying those drafts to ALEXG and MIF.

33. Defendants asked the Members, including ALEXG and MIF, to sign a Consent form that authorized, approved, adopted and confirmed all terms and provisions of the APA, and authorized the Board of Mangers to take all steps to finalize and effectuate the APA and all related documents.

7

34. The version of the APA that Taiber and Parrella, Jr. provided to ALEXG, MIF and other Members for approval, as part of the August 25, 2017 Member Consent form, included the representation and warranty affirming that there had been no infringement of ESCO IP.

35. The version of the APA provided for Member Consent contained a schedule indicating that the only ESCO assets that were not included as part of the assets sale to Five Elms were three JP Morgan bank accounts.

36. Plaintiff Goldstein signed the Member Consent form on behalf of ALEXG Holdings, and Plaintiff Friedgan signed the Member Consent form on behalf of MIF. Defendant Malkiewicz also signed the Member Consent form, on behalf of St. Clair Energy Associates, LLC. Goldstein and Friedgan returned those Member Consent forms to ESCO, Taiber and Parrella, Jr.

Defendants Demand that Plaintiffs Sign Non-Competition Agreements

37. Finally, in late August, as or after the Member Consent was being sought, Defendants informed Plaintiffs that, as part of the acquisition, Five Elms was insisting that ESCO Members ALEXG Holdings and MIF enter into expansive non-compete agreements. These non-competes sought to bind not only the two limited liability companies, but sought to restrict the activities of Goldstein, Friedgan and any company, including Eligo, with which Plaintiffs were affiliated or into which they had invested.

38. Plaintiffs indicated that they could not bind Eligo and its affiliates as part of a deal involving the acquisition of ESCO. They pointed out that ESCO had no right to demand such concessions of its Members and Managers, so Plaintiffs should not be required to make such concessions to Five Elms as part of an ESCO sale.

39. Defendants pushed back strenuously. ESCO and the individual Defendants repeatedly urged Plaintiffs to sign the non-compete terms demanded by Five Elms. In multiple

8

calls and emails to Goldstein and Friedgan, Parrella, Sr. emphatically tried to persuade Plaintiffs to stop objecting to the non-competes. Taiber and Parrella Jr. likewise communicated repeatedly with Plaintiffs, urging them to agree to the proffered non-compete terms in order to allow the sale to proceed. Defendants knowingly directed all of these communications relating to the non-competes to Plaintiffs while Plaintiffs were in Illinois.

40. Defendants argued, incorrectly, that ALEXG Holdings and MIF owed some sort of "duty" to ESCO that required ALEXG Holdings and MIF to restrict the activities of Eligo and other entities, even though the affected entities were unconnected to ESCO, were not wholly owned or controlled by Plaintiffs, and were to receive no compensation as part of the ESCO sale.

41. Ultimately, after much negotiation and discussion, the parties reached a compromise.

42. First, ALEXG HOLDINGS and MIF signed revised non-compete agreements. The final versions of the non-compete agreements were not as broad as Five Elms originally had proposed and as Defendants had tried to persuade Plaintiffs to accept. In addition, Defendants and Five Elm insisted that ALEXG HOLDINGS enter into a Guarantee Agreement as part of the APA.

43. Second, the final Asset Purchase Agreement continued to include, unchanged, the representation and warranty that there had been no infringement or misappropriation of ESCO intellectual property.

44. Third, Five Elms reduced the price it was willing to pay by $650,000.

45. The Defendants and Cognitive Energy (an entity Five Elms formed) signed the September 12, 2017 Asset Purchase Agreement reflecting this compromise. Defendant Parrella Jr. signed the APA on behalf of ESCO. Defendants Taiber, Malkiewicz, and Parrella, Sr. approved

9

of the APA and authorized ESCO to proceed with the transaction. Goldstein and Friedgan and ALEXG HOLDINGS and MIF also authorized Managers to sign the APA.

Plaintiffs Learn of Defendants' Fraud

46. Now, more than a year after Plaintiffs agreed to the non-competes and authorized the APA, they have discovered that Defendants intentionally misrepresented and concealed facts in order to induce Plaintiffs to authorize the APA, to accept the non-competes, and to enter into the Guarantee Agreement binding ALEXG HOLDINGS.

47. The final version of the APA includes the specific representation and warranty regarding the ESCO technology that Cognitive (Five Elms) was acquiring. After broadly defining ESCO's "Intellectual Property Assets," APA Section 2.22 states:

> There has not been any unauthorized disclosure of any Intellectual Property Assets by Seller [ESCO] or by any, as applicable, member, manager, stockholder, director, officer or employee of the Seller. To the Knowledge of Seller, there is not and has not been any unauthorized use or disclosure, infringement, misappropriation or other violation of any Intellectual Property Assets by any person.

Ex. A, Asset Purchase Agreement, at 14.

48. During the weeks leading up to the final agreement on the terms of the APA, the Defendants negotiating the transaction on behalf of ESCO – primarily Michael Parrella, Jr. and Taiber – repeatedly sent drafts of proposed APA language to Plaintiffs. All the drafts and communications regarding the APA that Defendants provided to Plaintiffs in August and September of 2017 contained the same language, confirming that as part of any eventual transaction, ESCO would warrant that none of its IP assets had been improperly disclosed, infringed, misused, or misappropriated.

49. The version of the APA presented to Plaintiffs and other Members for formal Member Consent on August 25, 2017 contained the IP representation and warranty. This version was sent to Plaintiffs in Illinois.

50. Michael Parella, Jr. signed the APA, including this representation and warranty as to non-infringement of ESCO's IP, on behalf of ESCO. The other Defendants approved the APA and warranted that, as Members of ESCO, everything stated in the APA was accurate.

51. Those representations were knowingly false when made. In December 2017, ESCO filed a lawsuit against Goldstein, Friedgan, Eligo and others in Connecticut federal court, alleging that ESCO discovered during the negotiation of the APA that Plaintiffs and Eligo purportedly had misappropriated ESCO trade secrets at some point between 2012 and 2015.

52. ESCO eventually withdrew that action and filed a Connecticut state court action against Eligo, which action is still pending, and which likewise alleges that ESCO discovered during the negotiation of the APA that Eligo purportedly misappropriated ESCO trade secrets at some point between 2012 and 2015.

53. If ESCO and Defendants believe that allegation to be true – and they have authorized the filing of two lawsuits making those allegations – then they knowingly lied when they warranted in the APA that there had never been any such misappropriation. Parrella Jr. signed the APA with this representation and warranty that ESCO now alleges to have been false.

54. ESCO and Defendants knowingly misrepresented the facts when they asked Plaintiffs to sign Member Consents, on behalf of ESCO, which confirmed a version of the APA that included the representation and warranty as to non-infringement of IP. Malkiewicz signed the Member Consent approving an APA that contains a representation and warranty that ESCO now alleges to have been false.

11

55. There is more. The APA contains a number of attached Schedules. One of them, Schedule 1.2(g), identifies assets that are excluded from the sale of all ESCO assets to Cognitive.

56. Prior to the APA being signed, ESCO and the other Defendants provided Plaintiffs with several drafts of the APA for Plaintiffs' review. Several drafts that Plaintiffs received and reviewed prior to release of signatures by the attorneys included copies of Schedule 1.2(g), and all draft versions of Schedule 1.2(g) listed a single asset being withheld – a group of three bank accounts at JP Morgan.

57. According to all of the drafts they were given for review prior to finalization of the APA, the only assets ESCO was excluding from the assets being sold to Cognitive were three JP Morgan bank accounts of no interest or concern to Plaintiffs.

58. More than a week *after* the APA closed, Goldstein and Friedgan requested, and received, a copy of the complete APA as executed. In that version, for the first time, Schedule 1.2(g) contained a second excluded asset:

> Claim or cause of action against Eligo Energy, LLC, VIR Technologies, LLC and/or their affiliates and related parties, for possible infringement of Seller's intellectual property rights or breach of such parties' duties to Seller arising and accruing prior to the Closing Date.

Ex. A, APA, at Schedule 1.2(g).

59. Defendants lied about whether they believed there had been any misappropriation of ESCO IP, then affirmatively withheld from Plaintiffs the fact that Defendants intended to sue them and Eligo once the APA closed. Defendants went so far as to induce Plaintiffs to agree to a draft of the Asset Purchase Agreement that nowhere mentioned a lawsuit against their affiliates, including Eligo, and then snuck in a never-before-seen Schedule 1.2(g) that granted ESCO the right to sue Eligo and its affiliates.

60. Defendants engaged in this fraudulent course of conduct because they recognized, quite correctly, that Plaintiffs would never have agreed to the terms of the APA, the Guarantee Agreement, and non-competition agreements, had Defendants been truthful. Plaintiffs now bring this action to undo the damage caused by Plaintiffs' intentional deception.

61. As Defendants were aware that Plaintiffs conducted business in Illinois, Defendants knew that any injury suffered by Plaintiffs as a result of their fraudulent misrepresentations would be suffered in Illinois.

Count One -- Fraud

62. As Paragraph 62, Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 61 as if set forth in full.

63. Plaintiffs have been defrauded as a result of the misrepresentations outlined in Paragraphs 18 through 61, relating to the whether there had been a prior infringement of ESCO IP and whether ESCO was carving out of the Cognitive sale possible claims against Plaintiffs.

64. Defendants made the misrepresentations in Paragraphs 18 through 61 as part of their scheme to push through the sale of ESCO to Cognitive. Defendants stood to benefit financially as a result of that sale, and did benefit when the sale was completed

65. Defendants knowingly directed the misrepresentations in Paragraphs 18 through 61 to Plaintiffs Goldstein, Friedgan, ALEXG and MIF in Illinois, where Plaintiffs received and acted upon the false information supplied by Defendants.

66. Defendants knew that Plaintiffs would not have approved the sale if Defendants had been truthful about their supposed belief that Eligo had stolen ESCO intellectual property, and about ESCO's carve out of its right to sue Eligo after completion of the sale to Cognitive.

67. Plaintiffs relied on the misrepresentations in Paragraphs 18 through 61 in agreeing to the Member Consent, in accepting the terms of multi-year non-compete agreements binding ALEXG and MIF, and in approving the terms of ESCO's assets to Cognitive. Plaintiffs would not have agreed to any of these documents if Plaintiffs had known the truth about the misrepresented facts.

68. Defendants provided day-to-day management of ESCO and were directly involved in the negotiations with Five Elms/Cognitive. It was reasonable for Plaintiffs to rely on Defendants' representations in considering the progress of negotiations, the terms of the asset sale, and the consents and approvals required of ESCO Members.

69. As a result of Defendants' misrepresentations, Plaintiffs have surrendered their investment interests in ESCO, they have limited the future opportunities available to ALEXG and MIF and their affiliates, and face possible damages and legal costs of more than $800,000 in connection with defending against the ESCO lawsuit in Connecticut.

Count Two – Negligent Misrepresentation

70. As Paragraph 70, Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 61 as if set forth in full.

71. All of the misrepresentations in Paragraphs 18 through 61 were false when made.

72. Defendants Parrella. Jr., Parrella, Sr., Taiber and Malkiewicz made the misrepresentations in Paragraphs 18 through 61 in the course of their work for and with ESCO.

73. Defendants made the misrepresentations in Paragraphs 18 through 61 for the purpose of providing information to others – Goldstein, Friedgan, ALEXG and MIF – as those persons and entities evaluated whether to approve the terms of a sale of ESCO assets to Cognitive.

74. All four Defendants failed to exercise reasonable care and competence in communicating the misrepresentations at Paragraphs 18 through 61 to Plaintiffs. If Defendants had exercised reasonable care and competence, they would have learned that the misrepresentations described at Paragraphs 18 through 61 were not true.

75. Defendants relied on the misrepresentations supplied by Parrella, Jr, Parrella, Sr., Taiber and Malkiewicz.

76. As a result of Defendants' misrepresentations, Plaintiffs have surrendered their investment interests in ESCO, they have limited the future opportunities available to ALEXG and MIF and their affiliates, and face possible damages and legal costs of more than $800,000 in connection with defending against the ESCO lawsuit in Connecticut.

**WHEREFORE**, Plaintiffs Goldstein, Friedgan, ALEXG Holdings and MIF pray that this Honorable Court enter judgment in their favor and against Defendants in an amount to be established at trial in this matter, but which award shall include

1. A recovery of the value of the surrendered ALEXG and MIF interests in ESCO, worth net of APA payments received, worth more than $150,000;

2. Compensation for the value of business opportunities that were lost to ALEXG and MIF, as a result of their agreeing to multi-year non-compete agreements that were procured via misrepresentation, restrictions on business activities that are believed to have cost Plaintiffs and their businesses more than $2,000,000;

3. Recovery of all fees, costs, expenses and judgments incurred by or awarded against Plaintiffs and Eligo, which already exceed $10,000 and may amount to as much as $800,000, in defending against the lawsuits ESCO has filed in Connecticut, and about which Defendants affirmatively deceived Plaintiffs during the ESCO-Cognitive negotiations.

4. Pre-judgment and post-judgment interest;

5. All other damages established by the evidence at trial; and

6. Such other relief and this Court and the fact-finder deems just and appropriate.

Dated: May 3, 2019

                                  Respectfully submitted,

| | |
|---|---|
| James L. Thompson (IL 6199621) | Plaintiffs Alex Goldstein, Mark Friedgan, ALEXG |
| Mindy S. Schwab (IL 6296233) | Holdings, LLC and MIF, LLC |
| LYNCH THOMPSON LLP | |
| 150 South Wacker Dr., Ste 2600 | |
| Chicago, IL 60606 | |
| 312-346-1600 | By: /s/ James L. Thompson |
| jthompson@lynchthompson.com | One of Their Attorneys |
| mschwab@lynchthompsonc.com | |
| dockeing@lynchthompson.com | |